HARRY WARDMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22348. Promulgated September 23, 1931.

*Meredith M. Daubin, Esq.,* for the petitioner.
*L. A. Luce, Esq.,* and *F. L. Van Haafton, Esq.,* for the respondent.

104

OPINION.

Morris: Section 229 of the Revenue Act of 1921, which petitioner asserts is applicable to the facts herein, provides:

That in the case of the organization as a corporation within four months after the passage of this act of any trade or business in which capital is a material income-producing factor, and which was previously owned by a partnership or individual, the net income of such trade or business from January 1, 1921, to the date of such organization may at the option of the individual or partnership be taxed as the net income of a corporation is taxed under Titles II and III; in which event the net income and invested capital of such trade or business shall be computed as if such corporation had been in existence on and after January 1, 1921, and the undistributed profits or earnings of such trade or business shall not be subject to the surtaxes imposed in section 211, but amounts distributed on and after January 1, 1921, from the earnings or profits of such trade or business accumulated after December 31, 1920, shall be taxed to the recipients as dividends; and all the provisions of Titles II and III relating to corporations shall so far as practicable apply to such trade or business: *Provided,* That this section shall not apply to any trade or business, the net income of which for the taxable year 1921 was less than 20 per centum of its invested capital for such year: *Provided further,* That any taxpayer who takes advantage of this section shall pay the tax imposed by section 1000 of the Revenue Act of 1918 as if such taxpayer had been a corporation on and after January 1, 1921.

The above section sets up three essential requirements for the taxing of individual or partnership income for the year 1921 at corporate rates; that is, capital must be a material income-producing factor, there must be an organization as a corporation within four months after the passage of the Revenue Act of 1921, and the provisions of the above section shall not apply to a trade or business, the net income of which is less than 20 per centum of its invested capital for 1921. We have found as a fact that capital was a material income-producing factor in the petitioner's business, leaving two remaining essentials which must be satisfied in order to entitle him to the benefits of the said section. A failure to meet either of these essential requirements will bar petitioner from the relief sought.

The question of whether petitioner's business was organized within four months after the passage of the Revenue Act of 1921 is one of law, which must be determined from an examination of the laws of the State of Virginia wherein the Wardman Construction Company, Incorporated, was organized. It can not be denied that this corporation ultimately came into legal existence and was organized within the meaning of the Revenue Act, but our question is whether that organization was so far perfected on March 23, 1922, four months after the passage of the Revenue Act of 1921, that there was at that time an "organization as a corporation" within the meaning of section 229, *supra.*

Title 35 of the Virginia Code of 1924, chapter 148, relating to the creation of corporations other than public service corporations, section 3849 thereof, provides that any three or more persons may by executing, filing and recording a certificate of incorporation, associate themselves together under the provisions and subject to the requirements of this chapter to establish a corporation. Section 3850 states that the certificate of incorporation shall set forth the name of the corporation, which shall contain the word "corporation" or the word "incorporated," and shall be such as to distinguish it from any other corporation engaged in a similar business or promoting or carrying on similar objects or purposes in the State of Virginia; the name of the county, city or town wherein the principal office of the corporation is to be located; the purpose for which the corporation is formed; the maximum and minimum amount of its capital stock, the division of the shares, and a description of the different classes of stock, if any, and the terms on which such different classes are created; the duration of the corporation; the names and residences of its officers and directors who "unless sooner changed by the stockholders, are for the first year to manage the affairs of the corporation"; the amount of real estate to which its holdings at any time are to be limited; etc. Section 3851 provides for the signing of the certificate by at least three persons, who shall acknowledge the said certificate before an officer of the State of Virginia authorized to take acknowledgments of deeds, and present it to the judge of the circuit court of the county or of the circuit, corporation or chancery court of the city wherein the principal office of the corporation is to be located. The said judge is to certify thereon whether the certificate is duly signed and acknowledged and if not, in what respect it is faulty. Upon indorsement by the judge and the payment of any fee or tax, the certificate of incorporation is presented to the corporation commission of Virginia, which ascertains and declares whether the applicants have entitled themselves to a charter by compliance with the law. Upon issuance of the cer-

tificate by the State corporation commission showing a compliance with the law, the secretary of the Commonwealth records the charter in the charter records of his office and certifies the same by registered mail or personal messenger to the clerk of court wherein the corporation's principal office is to be located, etc. This section further provides that:

As soon as the charter shall have been lodged for recordation in the office of the secretary of the Commonwealth, the persons who signed and acknowledged said certificate, and such other persons as may be associated with them according to the provisions of law, or of their charter and their successors, shall be a body, politic and corporate, by the name set forth in the said certificate, with the powers and upon the terms set forth therein, so far as not in conflict with law; and in addition shall have all the general powers and be subject to all general restrictions and liabilities conferred and imposed by this chapter and by the general laws of this State applicable thereto.

Title 34 of the said code, entitled "General Provisions Applicable to Corporations," chapter 147 thereof, provides in section 3788 as follows:

§ 3788. How subscriptions to capital stock may be paid; liability of subscriber; financial organization and disposition of stock; statement to be filed with the commission; penalty.—Subscriptions to the capital stock of any corporation may be paid in money, land, or other property, real or personal, leases, options, mines, minerals, mineral rights, patent rights, rights of way, or other rights or easements, contracts, labor, or services; and there shall be no individual or personal liability on any subscriber beyond the obligation to comply with such terms as he may have agreed to in his contract of subscription; and any corporation may adopt such plan of financial organization and may dispose of its stock or bonds for the purposes of its incorporation at such prices, for such consideration, and on such terms and conditions as it sees fit; but, before making any issue of its stocks or bonds it shall file with the State corporation commission a statement (verified by oath of the president or secretary of the corporation, and in such form as may be prescribed or permitted by the commission), setting forth fully and accurately the basis or financial plan upon which such stock and bonds are to be issued; and where such basis or plan includes services or property (other than money) received or to be received by the corporation, such statement shall accurately specify and describe in the manner prescribed or permitted by the commission the services and property, together with the valuation at which the same are received, or to be received, and the judgment of the directors as to the value of such land or other property, real or personal, leases, options, mines, mineral rights, patent rights, rights of way, or other rights or easements, contracts, labor, or services in the absence of fraud, participated in by both parties to the transaction shall be conclusive.

For any violation of this section the offending corporation shall be liable to a fine of not less than ten or more than one thousand dollars, to be imposed and judgment entered therefor by the State corporation commission, and shall be enforced by its process.

It appears from the foregoing summary of the Virginia enabling statutes that on March 23, 1922, the Wardman Construction Company, Incorporated, had complied with all the requirements of law

relative to certification by the circuit judge and by the State corporation commission. These certifications, together with the recordation, made the construction company a body politic and corporate, endowing it with all the general powers and subjecting it to all the general restrictions and liabilities conferred and imposed by the said statutes. So far as the State of Virginia was concerned, the structural formation of the corporation was completed with the recordation of the charter in the office of the secretary of the Commonwealth, and thereafter the officers and directors named in the certificate of incorporation were empowered to manage the affairs and business of the corporation for the first year of its existence unless sooner changed by the stockholders.

It is unquestionably true, as shown by the facts, that at March 23, 1922, there were certain internal proceedings which ·had not then taken place, such as the first meetings of the stockholders and directors, the filing of statements with the State corporation commission showing the basis or financial plan to be adopted by the corporation upon the issuance of its stocks or bonds, as required by section 167 of the constitution of Virginia and section 3788 of the Virginia Code, *supra*, and the formal taking over of the business and assets by the officers and directors selected by the stockholders. However, these steps, in our opinion, were not necessary under the laws of Virginia in order that there may be an organization as a corporation. The corporation as it existed on March 23, 1922, was fully capable of conducting its business and transacting its affairs for one year after the charter was issued, without further action by the incorporators or stockholders, section 3850. The statements that the incorporators were required to file showing the basis or financial plan upon which its stocks or bonds were to be issued, section 3788, were for the purpose of doing away with the common law liability of stock subscribers, and protecting them from any future redress by creditors of the corporation on their subscriptions. *Monk* v. *Barnett*, 113 Va. 635; 75 S. E. 185. Even though the facts herein show that the said statements had not been filed by March 23, 1922, such a provision does not in our opinion preclude a corporation from being formally organized, although failure to comply might lay it open to a penalty by way of fine. Likewise, in view of the general powers given to corporations under the said enabling statutes, the incorporators were perfectly capable of transacting the construction company's business without the necessity of formal minutes showing the action of the stockholders in turning over the petitioner's business and assets to the officers and directors.

The respondent relies on the requirements of section 3788 of the Virginia Code, and the fact that the statements therein provided for

had not been filed with the State corporation commission by March 23, 1922, as showing that petitioner's organization was unperfected. Upon examining the above section and the instructions accompanying the blank forms, which have been set forth in our findings of fact, it is our opinion that the filing of said statements was not a condition precedent to the organization of the corporation. One set of instructions stated that the report must be filed " as soon as the corporation is organized," which indicates that the corporation did not remain in an unorganized condition until the statement was filed. We believe that any reasonable time after the organization, but before issuance of stock, was sufficient as to the one report, and that any reasonable time after organization was sufficient as to the other.

We have examined the authorities cited by respondent in support of his contention that petitioner's organization as a corporation was unperfected at March 23, 1922, but we are unable to agree that these authorities are controlling. In *Welch* v. *Old Dominion Mining Railroad Co.*, 10 N. Y. S. 174; 56 Hun. 650, the question presented was whether an attorney could recover for services which he had rendered to assignees of a charter originally granted by the State of Virginia to certain incorporators. That particular portion of the opinion upon which the respondent relies is the statement of the court that " under the laws of which state [Virginia] the corporation must be organized within two years after the charter is granted, else the grant will be absolutely void * * *." In that case the grant of the charter was originally made in 1882, and after a purported assignment of the said charter an organization was attempted thereunder in New York in 1886, and the plaintiff attempted to recover for his legal services to the assignees as their counsel. The court held that the charter was not assignable, that an attempted organization by persons to whom the charter was attempted to be assigned was void, and that a corporation *de facto* can not be created by user under such organization. In our opinion the above statement of the *Welch* case clearly distinguishes it from the question which we have presented herein.

In *Ward-Truitt Co.* v. *Bryan & Lamb*, 144 Ga. 769; 87 S. E. 1037, two partners attempted to deny their individual liability to creditors upon the strength of securing a charter and agreeing verbally between themselves that they would occupy certain official positions in a proposed corporation. There was no organization of the corporation, no subscription to its capital stock and no minutes of meetings of the alleged stockholders. The court in its opinion pointed out that this was not merely the case of a defective or imperfect organization of a corporation, or some irregularity in the

formation of a corporation, but that the alleged corporation was actually nonexistent. We believe that this case is likewise distinguishable as to its facts, and, furthermore, it appears that the laws of Georgia relating to incorporation disclose no such provisions as are found in sections 3850 and 3851 of the Virginia Code, which we have summarized above.

The laws of Georgia provide that the power to create a corporation is vested solely in the general assembly and the courts, Park's Annotated Code of Georgia, 1914, section 2192. In Georgia the organization of a corporation is not completed until the charter is issued and organization under the charter has been perfected. The law is stated in *Michael Brothers Co.* v. *Davidson & Coleman*, 3 Ga. App. 752; 60 S. E. 362, as follows:

A corporation is not a person in law until after the grant of its charter (*Bartram, Hendricks & Co.* v. *Collins Mfg. Co.*, 69 Ga. 751) ; and, after a charter is granted, it has no authority to transact business until legal organization. Without charter and organization, "it could do no corporate act, could receive no corporate property, could incur no corporate liability, and against it no corporate judgment could be legally rendered." *Rau* v. *Union Paper Mill Co.*, 95 Ga. 212, 22 S. E. 146.

In *Planters Insurance Co.* v. *Tennessee, for the use of Memphis*, 161 U. S. 193, the legislature of the State of Tennessee incorporated an insurance company in 1860 with a provision in the charter limiting its taxation to one-fourth of one per cent of its capital stock. In 1870 that State adopted a new constitution forbidding such limitation. From 1860 down to January 30, 1884, the incorporators of the said insurance company took no action toward organizing a corporation to accept the aforesaid charter. On January 30, 1884, the then surviving incorporators met and organized the insurance company originally chartered, subscribed to its capital stock, held stockholders' and directors' meetings, elected its officers, and thereafter functioned continuously as a corporation. In 1885 the insurance company changed its name to Planters' Fire and Marine Insurance Company, increased its capital stock, and since then has paid taxes on the increased capital stock at the rate named in the 1860 Act. Suit was brought by the State of Tennessee to recover taxes at the regular rate, which was in excess of the above limitation. The Supreme Court held that, since the organization of the corporation had been made subsequent to the adoption of the constitution of 1870, the corporation was subject to the provision thereof regulating taxation.

The last mentioned case, we think, is distinguishable because the corporation grew out of a legislative enactment which required an acceptance and an organization under the terms of the said act.

The corporation was not created under enabling statutes, such as appear in the Virginia Code. Furthermore, the court found as a fact that the corporation had not been organized prior to the adoption of the constitution of 1870, and that, as its organization occurred thereafter, it must have been with due regard to the constitution then in force.

In our research we have failed to find any decisions by Virginia courts determinative of this question, but we do find support for our decision in certain cases arising in jurisdictions other than Virginia involving the terms " organization," " organizing," and " to organize." In *Morrison* v. *Clark*, 24 Mont. 515; 63 Pac. 98, the court was confronted with the question of whether a certain mining company, incorporated under the general laws of Montana, had sufficiently completed its organization so that it became invested with title to certain property that had been conveyed to it. The court, after summarizing the general laws of Montana relative to incorporation, which laws are similar to the laws of Virginia, stated:

* * * Failure to hold any meeting of the stockholders or directors and omission to commence business in no wise prevented the Golden Gate Mining Company from becoming a corporation; nor did either omission, or both of such omissions, operate to dissolve the corporation, or invalidate its acts or proceedings already taken, under which it had become a corporation. By the conveyance it became invested with whatever title the plaintiff possessed.

The court then goes on to state that corporations organized under authority of general laws are organized by a compliance with the provisions of such general laws permitting corporations to be formed, and that such compliance results, of itself, in the organization of the corporations. Organization, according to the opinion, has no reference to the internal proceedings of the corporation, such as a meeting of the stockholders and the like, but means " the formation or birth of the body corporate." In *Commonwealth* v. *William Mann Co.*, 150 Pa. St. 64; 24 Atl. 601, the court said: " To organize is to furnish with organs." In *First National Bank of Detroit* v. *Board of Commissioners of Beltrami, Canada*, 77 Minn. 43; 79 N. W. 591, the court stated that " organizing " a county is the vesting of the people of such territory with corporate rights and powers. In *Daily* v. *Marshall*, 47 Mont. 377; 133 Pac. 681, the court stated, " The requirements to be observed for the perfection of the organization, the election of officers, and the like pertain exclusively to its private affairs, of which the public can have no information, and in the absence of statutory provisions to the contrary, or of inquisition at the instance of the state, are to be deemed directory only. 10 Cyc. 223; Mechem on the Law of Corporations, § 163."

In view of the above discussion of cases and the summary of the Virginia enabling statutes, we are of the opinion that the petitioner's

business was sufficiently organized on March 23, 1922, to come within the provisions of section 229 of the Revenue Act of 1921. On that date the officers and directors named in the certificate of incorporation were empowered by the State to carry on its business as a corporation. The fact that its internal affairs had not at that time been completely adjusted is, in our opinion, immaterial so far as the Federal statute in question is concerned, which provides only that, "in case of the organization as a corporation * * *" of any trade or business, the petitioner shall have the option of having its net income taxed at corporate rates.

The second test which a taxpayer must meet to be entitled to have the net income of his trade or business taxed as a corporation is taxed is that the net income must not be less than 20 per centum of the invested capital. The petitioner contends that it meets this test, asserting that the evidence proves the net income of the business, computed upon a corporate basis, to be $77,495.48, and the invested capital to be $362,986.47. The respondent contends the petitioner does not meet the test, asserting that when correctly computed the net income is $62,495.48 and the invested capital is $760,437.59.

The difference in the net income as computed by the parties is $15,000, and this is due to the difference between them as to what constitutes a reasonable allowance for compensation to the petitioner for services rendered the business during the taxable year. The respondent says that a reasonable allowance is $50,000, while the petitioner contends that $35,000 was a reasonable compensation for the services he rendered. We think the petitioner is right. The fact that the petitioner withdrew a net amount of $51,025.23 from the business, in 1921, is not *ipso facto* conclusive that such a sum is a reasonable compensation for his services. Obviously, if a sole proprietorship is sufficiently fortunate as to realize net earnings which are not entirely needed in the further conduct of the business, the proprietor will convert the excess earnings into other investments or appropriate them to his personal needs and welfare. Withdrawals under such circumstances bear no relation to a reasonable compensation for services, since they involve in addition to compensation the taking of profits no longer necessary in the business. While the evidence as to what is a reasonable compensation to the petitioner for services rendered in the taxable year is quite meager, it is sufficient to enable us to make a finding in that respect. Wardman's testimony is in the record without objection and stands unrefuted or unweakened by cross-examination. In addition, we have the fact of payment to Wardman in the following year, by the successor corporation, of $50,000 as compensation for that year when the earnings of the corporation were approximately three and one-half times those of the business for 1921. The evidence indicates that $35,000 was a reason-

able compensation to the petitioner for 1921, and we have made a finding that such is the case. Accordingly, we conclude that the net income of the petitioner's business, for the taxable year 1921, computed upon a corporate basis, is $77,495.48.

This brings us to the determination of what is the petitioner's invested capital for 1921. His books of account show a net worth of $824,142.56 and $218,926.59, as of January 1 and December 31, 1921, respectively. The facts, however, indicate quite clearly that these amounts are incorrect, because of errors of omission and commission in recording, or in failing to record, certain transactions on the books. In the first place, the respondent determined that the net worth as of January 1 was overstated by $20,000, because of an understatement of a like sum in the accounts payable, and that the net worth as of December 31 was overstated by $4,298.40, because of an understatement of $20,000 in the accounts payable, an arbitrary writedown of $3,763.22 in the book value of stocks and bonds, and an understatement of $11,938.38 in the asset account " Construction." The determination of the respondent in respect of these items, which reduces the net worth as of January 1 and December 31 to $804,142.56 and $214,628.19, respectively, is not contested by the petitioner. There are also the further facts revealing the petitioner's failure to record on his books, prior to 1921, the gift to his daughter in 1917 of certain stock of the Swartzell, Rheem & Hensey Company, of the book value of $160,000; his failure to record on his books, prior to 1921, the disposition before December 31, 1920, through gifts to his wife and daughters and sales, of 6,738 shares of preferred and 202 shares of common stock of the Wardman Park Hotel Company; and the charging against surplus, in 1921, in recording the disposition of the hotel company stock, of an amount in excess of the actual cost of that stock as determined by the respondent.

The Swartzell, Rheem & Hensey Company stock, which was carried on the petitioner's books, at December 31, 1920, at a value of $160,000, was given outright by the petitioner to his daughter, Alice Wardman Rheem, in 1917, and it should have been charged off against surplus on the petitioner's books at the time of the gift. Accordingly, the net worth as of January 1, 1921, should be reduced by $160,000.

The petitioner disposed of the Wardman Park Hotel to the Wardman Park Hotel Company for 10,000 shares of the preferred and 173,080 shares of the common stock of that company. The cost of the hotel property to the petitioner was $758,235.02. The respondent determined that the value of the stock received in exchange was equal to the cost of the hotel, and he allocated the value to the preferred and common stock on the basis of a value of $27.76 per share

of preferred and $2.77 per share of common. The respondent's determination in these respects is not contested by the petitioner. Prior to December 31, 1920, the petitioner disposed of 6,000 shares of the preferred by gifts to his wife and daughters, and 738 shares of the preferred and 202 shares of the common by sales. The petitioner did not make any record of the disposition of these shares on his books until 1921, and, consequently, his net worth as of December 31, 1920, as shown by his books, is overstated to the extent of the cost of the shares so disposed of. The cost of these shares, based upon the respondent's allocated per share value of $27.76 for the preferred and $2.77 for the common, is $187,606.42, and the net worth as of December 31, 1920, should be reduced by that amount.

As of December 31, 1921, the petitioner reduced the " Stocks and Bonds " account, by a credit thereto and a charge to surplus, by $516,180.45, to record the disposition of the shares above referred to. Since the cost of these shares to petitioner was but $187,606.42, stocks and bonds account and surplus (net worth) were erroneously reduced $328,574.03, and the net worth as of December 31, 1921, should, accordingly, be increased by that amount.

The petitioner contends that the net worth at January 1 and December 31, 1921, should be further reduced by $15,000, because of appreciation of that amount in the book value of the Braddock Heights Hotel, but the evidence presented by the petitioner is wholly inadequate to support that contention.

In view of the adjustments which we have directed be made in the net worth as reflected by the books of account, we find that the correct net worth of petitioner's business at January 1 and December 31, 1921, is $456,536.14 and $543,202.22, respectively; that the total assets of the business, at the same dates, are $3,526,006.84 and $4,130,139.14, respectively; that the inadmissible assets of the business, at the same dates, are $655,972.19 and $655,570.31, respectively; and that the percentage which the amount of inadmissible assets is of the amount of admissible and inadmissible assets held during the taxable year is 17.13. A computation of invested capital based upon these facts discloses that the net income of the petitioner's business for the taxable year 1921 is more than 20 per centum of such invested capital.

At the rehearing respondent amended his answer by alleging that since petitioner had filed an individual return, computed the tax on the income reported thereon, and paid the tax returned, that his acts constituted an election and/or ratification of the option granted by section 229, and that he can not now change to a corporate basis. In support of this allegation respondent points to petitioner's individual return for 1921, his quarterly payments of the tax returned, and the intention and efforts of petitioner to incorporate his busi-

ness prior to the due date of the return. Respondent asserts that the language of section 229 stating that "the net income * * * *may at the option of the individual or partnership* be taxed as the net income of a corporation is taxed * * *," is to be determined in the light of equitable principles, and that the interested party may not exercise the option back and forth at his whim or caprice, but that, having once elected to report his income as an individual, he must now abide by the election which he made.

Respondent's argument would be much more forcible if as a matter of fact petitioner had an election on March 15, 1922, the due date for 1921 returns, filed on a calendar year basis. But actually petitioner had no such election, because there was no corporation then in existence which would have entitled Wardman to make an election. The final condition precedent to legal organization was not satisfied until March 23, 1922, and naturally at any time prior thereto the petitioner would have no election as to how he would report his income for 1921. We have not overlooked the fact that petitioner might have asked for an extension of time in which to file his return, but as this possibility was either unknown to him or else ignored, we see no benefit to be derived from considering what might have happened if he had acted differently. Furthermore, in view of the positive evidence that petitioner was incorporating his business to secure the benefits of a reduced tax rate, we are unable to agree that subsequent payments on the tax shown on his original return constituted an election to be taxed at rates applicable to individual incomes or a ratification of the only course that was open to him on March 15, 1922.

In view of the foregoing, we find that all of the requirements of section 229 of the Revenue Act of 1921 are satisfied in this case, and, accordingly, the petitioner is entitled to have the net income of his business for the taxable year 1921 taxed as the net income of a corporation is taxed, as provided by that section.

*Judgment will be entered under Rule 50.*